Joseph BEAUHARNAIS, Plaintiff-
Appellant,

v.

The PITTSBURGH COURIER PUBLISH-
ING CO., Inc., Defendant-Appellee.

No. 11670.

United States Court of Appeals
Seventh Circuit.

April 19, 1957.

Rehearing Denied May 10, 1957.

Joseph Beauharnais, Chicago, Ill., for appellant.

Leon H. Isaacson, Chicago, Ill., for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and SWAIM, Circuit Judges.

DUFFY, Chief Judge.

Plaintiff's complaint herein sought damages from defendant for publishing alleged libelous matter in the January 5, 1952 issue of its newspaper, The Pittsburgh Courier. Defendant is a Pennsylvania corporation, and plaintiff a resident of Illinois. Jurisdiction was based upon diversity of citizenship. The record indicates defendant's newspaper is circulated principally among members of the colored race.

Defendant published in its January 5, 1952 issue an article with a large headline "What's Behind the Cicero Riot?" Plaintiff's photograph appeared as part of the background for the headline. Also, as part of said background, was reproduced a circular or pamphlet with the heading "The White Circle League of America", which listed plaintiff as the founder. The circular was worded as follows:

"The White Circle League of America
  "Founder—Joseph Beauharnais
  "P. O. Box 531—Chicago 90, Illinois

"Dedicated to protect and maintain the Dignity, Social Edicts, Customs and rights of the White Race in America.

"Wanted

"One Million Self Respecting White People in Chicago to Unite under the Banner of the White Circle League of America to oppose the National Campaign now on and supported by Truman's Infamous Civil Rights Program and some Church Organizations to amalgamate the black and white races with the object of mongrelizing the white race!

"The White Circle League of America is the only articulate white voice in America being raised in protest against negro aggressions and infiltrations into all white neighborhoods. The white people of Chicago Must take advantage of this opportunity to become United. If persuasion and the need to prevent the white race from becoming mongrelized by the negro will not unite us, then the aggressions * * * rapes, robberies, knives, guns and marijuana of the negro, Surely Will.

"The Negro has many national organizations working to push him into the midst of the white people on many fronts. The white race does not have a single organization to work on a National Scale to make it's wishes articulate and to assert its natural rights to self-preservation. The White Circle League of America proposes to do the job.

"I wish to be enrolled as a member in The White Circle League of America, and I will do my best to secure ten or more members.

Phone.

"My name is .....................
Address ...................... "

After ten spaces for signatures and addresses, the circular concluded with:

"We must awake and protect our white families and neighborhoods before it is too late. Let us work increasingly to conserve the white man's dignity and rights in America.
"Joseph Beauharnais."

The words of the article of which plaintiff complained and set forth in his complaint are: "There is a sinister character in Chicago who is more dangerous than the nation's worst gangster. He conducts a vicious and risky business—the promotion of racial hatred, with biased whites as his steady clients. He has never engineered, as far as I know, any outrage like the Valentine Day massacre, but his atrocious activities, if permitted to continue, are sure to cause violent death to hundreds of unsuspecting American citizens who become victims of his bias plots * * * He defies all law and order in the performance of his defaming work. He is a menace to racial harmony in Chicago. This is the introduction to Joseph Beauharnais * * * ." "Beauharnais, tall, loose-jointed, shifty-eyed, was dressed in a shoddy blue suit with red and white stripes, probably in answer to his 'patriotic' tendencies."

As to damages, plaintiff averred in each Counts 1 and 2 "That by reason of the premises plaintiff has been damaged in the sum of One Million Dollars, for which he prays judgment." As to Count 3, Plaintiff alleged "By reason whereof the plaintiff has been damaged in his standing and reputation, and in his business and social relations, in the community in which he lives and elsewhere, in the sum of One Million Dollars, for which he prays judgment."

The original complaint was filed by plaintiff *pro se*, but an amendment to the complaint showing diversity of citizenship, was signed by plaintiff and by his attorney, Lawrence M. Fine.

Defendant's answer, among other things, averred the article declared on was published as a news item pertaining to plaintiff's activities as the founder of The White Circle League, and his actions creating and promoting racial discord and hatred. In substance, the answer al-

leged that the article was fair comment, and that it was written and published without malice. The answer denied that the statements therein were false and untrue and asserted that the article was published in good faith.

The trial in the District Court was before a jury. Defendant moved for a directed verdict at the close of plaintiff's evidence. The District Court granted the motion, whereupon the jury returned verdict in favor of the defendant. Judgment was entered accordingly from which this appeal was taken.

■ The law of Illinois is controlling. Spanel v. Pegler, 7 Cir., 160 F.2d 619, 621, 171 A.L.R. 699; Rose v. Indianapolis Newspapers, 7 Cir., 213 F.2d 227, 229. Article 2, § 4 of the Constitution of Illinois, S.H.A., provides:

"Freedom of Speech and Press— Libel.

"Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth, when published with good motives and justifiable ends, shall be a sufficient defense."

Illinois has a statutory definition of libel. Smith-Hurd Ann.Stats. Chap. 38, § 402, provides: "A libel is a malicious defamation, expressed either by printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule, or financial injury."

■ Although plaintiff complains of a relatively small part of the article published by defendant, he introduced the entire article in evidence. The words in the article must be construed according to the natural and obvious meaning of the words used, taking into consideration the article as a whole including the headlines. Cook v. East Shore Newspapers, 327 Ill.App. 559, 64 N.E.2d 751, 764; Gogerty v. Covins, 5 Ill.App.2d 74, 124 N.E.2d 602, 605; Kulesza v. Chicago Daily News, 311 Ill.App. 117, 35 N.E.2d 517, 521; Brewer v. Hearst Publishing Co., 7 Cir., 185 F.2d 846, 850; Schy v. Hearst Publishing Co., 7 Cir., 205 F.2d 750, 752; Rose v. Indianapolis Newspapers, 7 Cir., 213 F.2d 227, 229.

The article contains a review of the plaintiff's career commencing more than two years prior to January 5, 1952 (the date of publication) as the president and active head of "The White Circle League of America," directing and spreading hatred against the negro race. As the article points out, the plaintiff, during that period, was convicted in the Municipal Court of Cook County for violation of Illinois Revised Statutes, 1949, Chap. 38, § 471. The statute, as relevant, provides: "It shall be unlawful for any person, firm or corporation to manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place in this state any lithograph, moving picture, play, drama or sketch, which publication or exhibition portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed or religion which said publication or exhibition exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots * * * ." His conviction was affirmed on January 18, 1951 by the Supreme Court of Illinois, People v. Beauharnais, 408 Ill. 512, 97 N.E.2d 343, and was also affirmed by the United States Supreme Court on April 28, 1952, Beauharnais v. People of State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919.

The article here in question did not call plaintiff a gangster. It did state that he was a sinister character who was more dangerous than the nation's worst gangster because he conducts the vicious and risky business of the promotion of racial hatred. The article ventured the opinion that if plaintiff's activities continued, violent death might come to hundreds of unsuspecting Americans.

708

■ It is the law of Illinois that: "* * * the subject matter of the article constituted matter of public interest and concern, which under the current weight of authority is legitimate subject of criticism and comments by a newspaper, so long as it does so fairly and with an honest purpose. 'Such comments or criticisms are not libelous, however severe in their terms, unless they are written maliciously.' * * *." Kulesza v. Chicago Daily News, 311 Ill.App. 117, 35 N.E.2d 517, 520.

The subject matter of the Cicero riots was a matter of great public interest and concern. The press of the entire nation had given much publicity to the unfortunate occurrence. The record shows that during the violence of the Cicero riots the plaintiff was on the scene soliciting memberships for The White Circle League. Plaintiff's activities were a legitimate subject of fair criticism and comment. Criticisms directed to such a subject matter are not libelous, although severe in terms, unless they were written and published maliciously. Brewer v. Hearst Publishing Co., 7 Cir., 185 F.2d 846, 850; Kulesza v. Chicago Daily News, 311 Ill.App. 117, 35 N.E.2d 517, 521; Tiernan v. East Shore Newspapers, 1 Ill. App.2d 150, 116 N.E.2d 896, 898.

Although the criticism of the plaintiff's activities was couched in strong language, the attitude taken by the Courts where the subject matter is of great public concern may be shown by a quotation from the opinion of the Supreme Judicial Court of Massachusetts in Hartmann v. Boston Herald-Traveler Corporation, 323 Mass. 56, 80 N.E.2d 16, 19, where the court said: "Fair comment [on a matter of public concern] may be severe and may include ridicule, sarcasm, and invective. * * * But severity and vigor in expression, whatever evidential effect they may have, are not to be confused with malice in motive."

■ The question whether the words complained of are libelous *per se* was for the trial court to determine. Kulesza v. Chicago Daily News, 311 Ill. App. 117, 35 N.E.2d 517, 521. Construing the article according to its plain and ordinary meaning and considering the article as a whole, we are of the opinion that it did not exceed the limits of fair comment permitted in a matter of great public interest.

Judgment affirmed.